[L. A. No. 2049. In Bank.—August 31, 1908.]

## GARVEY WATER COMPANY (a Corporation), Respondent, *v.* HUNTINGTON LAND AND IMPROVEMENT COMPANY (a Corporation), Appellant.

CONTRACT TO FURNISH WATER—COVENANT TO INCREASE NATURAL FLOW — PUMPING-PLANT — DEVELOPMENT WORK. — Under a contract whereby the owners of a tract of land granted a full, uninterrupted, and perpetual flow of thirty inches of water arising therefrom, and covenanted that should such flow decrease on account of any unforeseen or uncontrollable cause or agency, they would "do and perform such other work towards restoring the flow of water from such land as any competent engineer that the grantee may select shall direct to be done, the necessary money to carry on such work of development to be advanced by the grantee," the latter has the right, upon a diminution of the flow below the amount granted, to insist upon the installation of a pumping-plant on the land in order to enhance the flow. The installation of such pumping-plant was "development work," within the meaning of the contract.

ID.—AGENCY NOT IN USE AT TIME OF CONTRACT.—The fact that at the time the contract was made pumps were not actually used on the land, or in its vicinity, for the purpose of raising water for irrigation, is immaterial as to the proper construction of the contract.

APPEAL from a judgment of the Superior Court of Los Angeles County. Curtis D. Wilbur, Judge.

The facts are stated in the opinion of the court.

Bicknell, Gibson, Trask, Dunn & Crutcher, and Edward E. Bacon, for Appellant.

Hutton & Williams, for Respondent.

LORIGAN, J.—This action was brought by plaintiff to enforce a right to thirty inches of water under a contract made with the predecessors of defendant. Judgment went for plaintiff and this appeal is taken by defendant from the judgment on the judgment-roll.

The facts found were, that on February 29, 1892, J. de Barth Shorb and his wife, owners of the Shorb ranch in Los Angeles County and predecessors in interest of the defendant, entered into a contract with one Richard Garvey, to whose interest plaintiff succeeded, relative to certain waters on the ranch.

The contract, which applies to the heirs and assigns of both parties, is quite lengthy, and its provisions as far as they relate to the present proceedings, were that in consideration of twenty-five thousand dollars, the Shorbs granted to Garvey the right to the full, uninterrupted, and perpetual flow of thirty inches of water, miner's measurement, under a four-inch pressure (each inch of water to be a flow of one fiftieth of a cubic foot of water per second), said water to be taken entirely from the Shorb ranch, and the right thereto to be the first or prior right to any waters then, or thereafter to be, developed or flowing upon or from said lands, subject only to the right to one inch of water theretofore granted for the cemetery at San Gabriel. It was mutually covenanted and agreed that the Shorbs did not warrant the continued flow of said thirty inches of water from said lands, although they did covenant and agree that water was then there and that they would do no act or deed which would diminish its flow, but, on the other hand, declared that it was their intention to continue developing the flow of water therefrom (and they reserved the privilege of so doing by boring wells, driving tunnels, and such other means as engineering skill shall suggest), it being understood that the right of the party of the second part to have and take the thirty inches of water hereinbefore sold to him was (subject to the flow of one inch sold to the cemetery) the first or prior right to any waters then, or thereafter developed on, flowing upon or from the said lands. It was further covenanted and agreed by the Shorbs that in case the flow of water then or thereafter developed by them upon the lands described should be decreased by any act of providence, or from any unforeseen or uncontrollable causes or agencies, to such

an extent that Garvey would not or should not receive the quantity of water to which he might at that time be entitled, then the Shorbs would, at the expense of Garvey, do and perform such further work towards restoring the flow of water from said land as any competent engineer that Garvey might select should direct to be done, the money necessary to carry on such work of development to be advanced by Garvey from time to time as such work progressed, it being always understood that the Shorbs were to do all such work of further development, and the party of the second part was to pay therefor in the manner before indicated in the contract. It was further covenanted and agreed that all of the waters in said instrument alluded to were waters either then arising upon or already developed or to be thereafter developed upon said tract of land, and that nothing therein contained should be construed to be a limitation upon the rights of the Shorbs to carry water from any other lands they might own to a reservoir situated on the said Shorb ranch and store waters therein, and that all waters so carried from those lands should not be deemed a portion of the waters granted to Garvey.

When this contract was entered into the Shorb ranch consisted of about five hundred acres, and at that time there was some eighty inches of water, miner's measure, flowing from natural springs and *cienegas,* and from artesian wells, on the portion thereof (about one third of the whole) which the contract described, and from which land the thirty inches of water were to be taken. For about eight years after the making of this contract there were on the Shorb ranch five wells located on a slope above the measuring box of plaintiff from which, at different periods during that time, the thirty inches of water called for were supplied. Originally the supply was furnished from two wells, but at the expiration of about a year, these failing to furnish the requisite amount, connections were successively made with the other wells in order to secure it. This water was supplied to the measuring box of plaintiff by gravity flow through tunnels and pipes from eight to twenty-one feet below the surface of the ground connecting with the wells. No pumping was used on the ranch for supplying water at the time said contract was made, nor till some years thereafter was water raised by pumps or pumping for irrigation in said county. A drouth had prevailed in southern

California from 1895-6 to 1899-00 which caused the flow from springs, *cienegas,* and artesian wells on the Shorb ranch and elsewhere in Los Angeles County, to materially decrease, and in some instances to cease to flow. During January, 1900, the plaintiff, who had succeeded to the interest of Garvey under the contract, could obtain its supply of water from but three of the wells referred to. At that date the supply of water from all sources on the whole of the Shorb ranch had so far diminished that there was no water flowing for use on the ranch, after deducting the thirty inches of water supplied under the Garvey contract, and in order to obtain water for irrigating the Shorb ranch itself, George S. Patten, the receiver of the Shorb ranch pending foreclosure proceedings, temporarily installed and connected with the three wells from which water was being obtained by plaintiff, an air-compressor plant which continued to supply the amount required by plaintiff, and the surplus obtained thereby was used on the Shorb ranch. This compressor was used for about two years and abandoned, whereupon it was discovered that the flow of water in said wells had so decreased that the plaintiff did not receive any more water than one half the amount to which it was entitled. At the time the compressor was abandoned the Farmers & Merchants' Bank of Los Angeles had become the purchaser of the Shorb ranch under foreclosure proceedings and on September 15, 1902, the plaintiff complained to said bank that it was not receiving its thirty inches of water and contended that it had a right to place a pump in one or more of the wells upon the ranch under the terms of its contract and by means of said pump to develop and take thirty inches of water. The bank denied the right of plaintiff to develop or take any water from said wells except by the natural flow from said wells passing through tunnels which had theretofore been driven. However, the plaintiff and said bank entered into an agreement by which the plaintiff was allowed at his own expense to install a pumping-plant temporarily in any or all of the wells on said lands. This agreement by its terms was terminable by either party on notice after one year from its date, and it was expressly stipulated that it should not affect the question between the parties as to their respective rights under the original contract between the Shorbs and Garvey. Under this agreement a pump was inserted in one of the wells

on the Shorb ranch and by means thereof plaintiff received, and continued to receive, its full thirty inches of water. Thereafter defendant became the owner of said Shorb ranch by purchase from said bank, and a similar contract was entered into between it and the plaintiff relative to the use of said pump, but about the twenty-first day of April, 1905, defendant notified plaintiff (as the agreement between them provided might be done) that it would no longer permit said pump to remain in said well, and demanded that it be taken out. Upon receipt of this notice and demand the plaintiff, by an order of its board of directors, and claiming the right to do so under a provision of the contract between the Shorbs and Garvey, selected Gervaise Purcell, an engineer, and directed him as such engineer to ascertain and report what further work upon the Shorb ranch was necessary in order to restore the flow of water to which plaintiff was entitled, and the amount of money necessary to carry on any work of development to attain that end. Purcell made an examination for the purpose desired and reported that it was necessary to install a pumping-plant of sufficient power and capacity to raise from one of said wells the amount called for in the contract. The report specified the character of engine and pump and the depth to which it should be submerged in the well in order to insure the delivery of said thirty inches of water. Upon receiving the said report, the plaintiff notified defendant of its selection of said Purcell as its engineer, accompanying the notice with a copy of the report of Purcell and a demand on defendant that it should do the work towards restoring said flow of water as was directed in the report of said engineer, with an offer on the part of plaintiff to advance the money necessary to carry on such work of development from time to time as the work progressed. Defendant refused to comply with this demand, and denied the right of plaintiff to develop or restore by means of any pump, any portion of said thirty inches of water; that there is flowing under the surface of the land on the Shorb ranch much more water than is sufficient to supply plaintiff with its thirty inches of water, and that the only method or way by which water can be developed from said Shorb ranch, so that plaintiff can receive its said water, was by means of a pump placed in a well, or wells, in the manner stated in the report of said engineer Purcell.

Upon the said refusal of defendant to comply with its demand plaintiff immediately commenced this action to have it decreed that under the terms of the contract it was entitled to have the flow of thirty inches of water restored to it in the manner indicated in the report of said Purcell by means of a pump placed in one or more of the wells on said Shorb ranch.

The court found the above facts and entered its decree in harmony with the relief asked by plaintiff. It decreed that the plaintiff was entitled to have said flow of water restored to it from the said Shorb ranch by means of a pump placed in one or more of said wells thereon, in the manner indicated in the report of Gervaise Purcell, and directed that upon the furnishing and supplying of the money required to carry on the work necessary to develop and restore said flow of water from the Shorb ranch as the work progressed, the defendant do and perform such work necessary for such purpose as directed in the report of said Purcell. It was further decreed that at the present time and under present conditions, and until it should become necessary for the plaintiff under the terms of its contract to change the location of the pumping-plant, the plaintiff was entitled to use for its pumping-plant to obtain its thirty inches of water, that certain described portion of the Shorb ranch, upon which at the commencement of the action, and at the time of the decree, there was a house in which was installed the pump and other necessary machinery constituting the pumping-plant, at and surrounding a well mentioned in the report of said Gervaise Purcell heretofore referred to.

The only question on this appeal is relative to the proper construction to be placed on the contract between the Shorbs and Garvey, of February 29, 1902. Does that contract give to plaintiff, as successor in interest of Garvey, the right to obtain the thirty inches of water called for therein, by means of pumping, or is it entitled to take only such waters as naturally flow from the land or may be caused to do so by means of the boring of wells or driving of tunnels?

It is insisted by the appellant that this latter is the construction which should have been given to the contract, and that the trial court erred in construing it as conferring a right to obtain such water by means of pumping.

It is unnecessary to discuss to any extent the various provisions of the contract which we have referred to. It is true, as contended by appellant, that the contract does not expressly provide that the Shorbs will supply to Garvey and his assignees thirty inches of water, nor do they warrant a continued flow from the Shorb ranch of water in that amount. They do, however, grant a full, uninterrupted, and perpetual flow of water, which they covenanted was, at the time of the making of the contract, in and under the ranch; that they would not do anything to divert the flow, but declared an intention to provide for further development, reserving a right to do so, by "boring of wells, driving of tunnels, and such other means as engineering skill may suggest." They also contract that should the flow of water, then or thereafter to be developed upon the land, and from which Garvey was to be supplied his thirty inches, decrease on account of any unforeseen or uncontrollable cause or agency, they would "do and perform such other work towards restoring the flow of water from such land as any competent engineer that the party of the second part (Garvey or his assigns) may select, shall direct to be done, the necessary money to carry on such work of development to be advanced by the party of the second part."

Under these provisions of the contract it was undoubtedly contemplated by the parties that there might be a decrease in, or even an entire cessation of, the flow of water from which Garvey was at any time receiving his thirty inches; that the sinking of wells or driving of tunnels would be inadequate to supply the quantity to which he was entitled; that neither the laws of gravity nor of nature could be relied upon to do so; and that to meet such a contingency resort would have to be had to a competent engineer who would possibly be able to suggest some other means or method by which the flow might be restored, and which would have to be adopted for that purpose.

It is insisted by appellant that while this may all be true, still that the means which might be resorted to under the familiar rule of *ejusdem generis* must be of the same character as those referred to specifically in the provisions of the agreement in which the Shorbs reserved to themselves the privilege of developing water on the land "by the boring of wells, driving of tunnels, and such other means as engineering skill may

suggest," and that pumping as a means of developing water is not of the same character as the means specifically referred to,—that is, by boring wells or driving tunnels.

But we do not think this provision is of special or any significance in determining the right of the plaintiff under the contract. That particular provision had reference to the means which the Shorbs reserved to themselves for the future development of water, which they declared they intended to make. In our judgment the rights of plaintiff are to be measured by the last clause in the agreement which we have heretofore quoted, and which confers on Garvey or his assigns the right to have an engineer of their selection determine what work was necessary to restore the supply of water which the Shorbs were to have done at the former's expense. This latter clause is quite different from the clause relied on by appellant—is broader in its terms and expressly gives a right to plaintiff which the other clause does not pretend to confer.

Assuming, however, that this provision relied on by counsel for appellant is applicable, and is to be taken into consideration with the other general provisions in determining the means which are to be employed in developing or restoring the flow of water in favor of plaintiff, we are satisfied that pumping is of the same general character to accomplish that purpose as "boring wells or driving tunnels." It will be observed that in the general clause the Shorbs covenant to perform such work towards restoring the water as a competent engineer may direct, and while this work is referred to as development work, there is undoubtedly meant by the use of that term the performance of such work as would in the judgment of an engineer accomplish the restoration.

It is possible, as suggested, that neither of the parties had in mind, when the contract was made, the use of a pumping-plant as a means of restoring the water. They probably assumed at that time that a sufficient supply would be obtained by artesian flow or by tunneling. It is true also that no pumping was being done on the ranch at that time, or, for that matter, in the county of Los Angeles, as a means for obtaining large quantities of water for irrigation or purposes of general utility. But pumping as a means of lifting water from wells or natural streams flowing from a lower level than the land to be irrigated has existed from remote times. For ages it has

been recognized in the older countries—in Europe, India, China, and Egypt—and applied for obtaining water for that purpose. While the earlier devices were primitive in their character, in the progress of the ages such improvements have been made in machinery and in mechanical devices, that pumps perfect in construction and adaptability are now, and for years have been, used as the most effective means for lifting large volumes of water from low levels for irrigation purposes.

It is not claimed that pumping for irrigation was not known at the time of the making of the contract, but only that the parties could not have had it in contemplation because it was not used on the ranch nor in the vicinity, the lower court finding that the high price of fuel for motive power for that purpose made it prohibitory, and the use of electricity for such motive power was then unknown. But we do not think that the fact that pumps were not actually used on the ranch, or in the county, is of any moment as far as the proper construction to be placed on the agreement is concerned. The grant to Garvey of these waters was a perpetual one,—to endure for all time, and he paid a large sum of money as a consideration for it. It was in contemplation of the parties that possibly in the course of years this water supply would so decrease that Garvey could not obtain the amount he purchased by the means which were then being adopted to supply it. In anticipation of being confronted with that situation, they proceeded to provide how it should be met. They assumed it would be a situation which the parties themselves would not be able to cope with, and so provided that some competent engineer should be selected to whom it would be left to determine what means should be adopted to restore the flow of water which has been purchased. When the means actually being used to produce the supply failed, it was provided that a competent engineer, a person who would have knowledge at the time the difficulty arose in obtaining the supply of water, of the most approved and adaptable methods and appliances to increase its flow, should be consulted and his advice followed. There is certainly no reason why the parties could not have so provided. It was a wise provision to insert to secure to Garvey the permanent flow of water which he had purchased, as long as any practicable means which a competent engineer might suggest could secure it to him. Whatever the

means may have been which the Shorbs reserved to themselves and declared their intention to develop the waters on the tract by, it is evident that under the provision of the contract we have been addressing ourselves to, the means which Garvey and his assigns were given the right to restore the water by were any means which a competent engineer should advise. The general language of the provision is capable of this construction, and there is no reason why a narrower construction should be given to it to defeat the right of plaintiff to a restoration of waters which the contract provided he should have restored by such means as an engineer should direct and which the trial court finds cannot be restored except by the installation of a pumping-plant.

It is claimed, however, that pumping is not the development of water, either in its primary sense or in the sense that the term was used in the contract. Appellant contends that true development work is merely the opening of new channels for the outflow of underground stores of water by the propulsion of the forces of nature, while pumping, on the other hand, is the forcible abstraction of these natural stores by foreign and artificial work, and that the term "development," as applied to obtaining a water supply, has a well-recognized meaning under the decisions of this court.

But if the driving of tunnels or making of cuts is the development of water, as it must be conceded it is, we perceive no good reason why the installation of a pump or pumping-plant is not equally such development. As said in *Charnock* v. *Higuerra,* 111 Cal. 473, 481, [52 Am. St. Rep. 195, 44 Pac. 171], every diversion "of water from a stream is a disturbance of the natural order of things. A dam or a ditch is as much an artificial mechanism as a pump; indeed, it may be much more so; and the one alters the natural condition in the same sense that the other does." Whether subterranean waters are procured by means of driving tunnels or the operation of pumps, they are obtained in either instance by artificial and not by natural means. Tunnels are practically horizontal wells, differing from ordinary wells only in this, that the waters from the former find their way by gravity flow, while in the latter pumping must be resorted to to bring the water to the surface. They both disturb the natural conditions of the flow of the subterranean waters and differ only as to the

method of that disturbance. The result, however, is the same; they are both artificial means of reaching and controlling the natural subterranean flow and are equally means of developing water.

Nor do we understand that the decisions referred to by counsel contain any definition of the term "development" as applied to subterranean waters. The cases referred to—for example, *Roberts* v. *Krafts*, 141 Cal. 20, [74 Pac. 281]; *Vineland Irr. Dist.* v. *Azusa Irr. Co.*, 126 Cal. 486, [58 Pac. 1057] —do not attempt to give any definition of the term. They simply hold that the things which were done in an effort to procure and control the subterranean waters were acts which constituted development. The development effected in those cases was by means of cuts and tunnels, and the court held that these constituted a development of water. The court did not hold that development could only be accomplished by such means, but simply that within the definition of development these means constituted it.

In the case at bar the wells from which plaintiff had been securing its thirty inches of water had so decreased in their flow that water could not be obtained from them by the tunnels which had been driven. As the only method whereby the flow of water could be restored was through the installation of a pumping-plant of the character decided on by the engineer, Gervaise Purcell, we are satisfied that whether the contract is to be construed as providing that a competent engineer shall suggest "development work" alone to be done to restore it, or that he could suggest any effective means to do so, even though it might not come within the definition of development work, that still the installation of a pumping-plant at the well as devised by him was "development work," and the development of waters for the purpose of restoring the amount to which plaintiff was entitled, and that this construction placed on the contract by the trial court was correct.

The judgment appealed from is affirmed.

Shaw, J., Sloss, J., Angellotti, J., and Henshaw, J., concurred.