[L. A. No. 2688.   Department Two.—October 13, 1911.]

## E. W. JONES, Appellant, v. I. N. VAN NUYS and KATE W. DOBBINS, Respondents.

CONTRACT.— RULES OF CONSTRUCTION — INTENT OF PARTIES. — In construing a contract the basic rule is to be adopted that each clause is to be considered with reference to every other clause upon which it has any bearing, and all the clauses and provisions are to be construed together as the unified medium whereby the intent of the parties to the instrument is to be reached.

GRANT OF WATER FROM ARTESIAN WELLS—SPECIFIC QUANTITY NOT CONVEYED—COVENANT TO AUGMENT FLOW.—A contract by an owner of land on which three artesian wells were located, by the terms of which he grants all the waters of the wells "now flowing or hereafter to flow" therefrom, does not convey to the grantees the right to any specific quantity of water. Nor is any specific quantity of water granted by a further provision in such contract, whereby the grantor covenanted that the quantity of water flowing from the wells at the time of its date measured more than one hundred and ten thousand gallons daily, and by which he agreed that if the flow decreased so as to measure less than one hundred and five thousand gallons, he would from the waters rising or flowing from or upon said land, or that can be developed or obtained therefrom, increase the flow to one hundred and ten thousand gallons.

ID.—LIMITATION ON AMOUNT OF AUGMENTED FLOW TO BE FURNISHED GRANTEE.—That such is the proper construction of the contract is made further apparent by a subsequent provision, providing that of the waters to be furnished from the land or that can "be developed ·or obtained" therefrom, the grantor shall not be required to furnish more than one third thereof.

ID.—GRANT OF ALL WATER FLOWING FROM WELLS.—What such contract did convey was all the water flowing from the wells, whatever that amount might be, with an accompanying agreement of the grantor that he would endeavor to keep that flow up to one hundred and ten thousand gallons, by certain means to be taken by him for that purpose, and to the extent of one third of the water obtained by such means.

ID.—OBLIGATION OF GRANTOR TO AUGMENT FLOW—PUMPING NOT REQUIRED—SINKING OF ADDITIONAL ARTESIAN WELLS.—Such covenant of the grantor to increase the flow of water, in the event that the flow from the wells fell below one hundred and five thousand gallons, did not compel him to resort to the means of pumping for its augmentation, where further provisions of the contract exactly defined how the increased flow should be developed and obtained, that is,

by the sinking of a number of shallow wells and by such means only, and provided if such means proved insufficient to furnish the grantees with one hundred and ten thousand gallons, that then the grantees might demand that one or more of the wells on the tract should be so deepened as to obtain such supply for them, the expense thereof to be borne by the grantor and the grantees in certain proportions.

ID.—ABSENCE FROM CONTRACT OF PROVISION FOR PUMPING—ARTESIAN FLOW ALONE CONTEMPLATED.—The entire absence in such contract of any mention of the use or employment of artificial means to furnish the grantees with water from the wells to be sunk or deepened, cannot be explained upon any other ground than that an artesian flow was all that was contemplated to be obtained by the particular means which it was provided that the grantor should adopt to secure the supply.

ID.—NO PROVISION IN CONTRACT FOR MAINTAINING PUMPING PLANT.— That the parties to such contract were relying for the supply of water upon the development of an artesian flow by the sinking of the shallow additional wells or the deepening of them, is further confirmed by the fact that the contract made no provision for the expense of installing, operating, or maintaining a pumping plant, while it did carefully stipulate as to who were to bear the expense or the proportions in which it was to be borne of the things that each was expressly required to do·under the contract.

APPEAL from a judgment of the Superior Court of Los Angeles County.   Charles Monroe, Judge.

The facts are stated in the opinion of the court.

Frank W. Burnett, and J. W. McKinley, for Appellant.

O'Melveny, Stevens & Millikin, for Respondents.

LORIGAN, J.—This is an appeal by plaintiff from a judgment entered against him after demurrer sustained to his amended complaint.

Kate W. Dobbins is made a party defendant under an allegation that she is a proper party plaintiff who refused to join with plaintiff as such and hence is made a defendant.   No relief is asked against her, the real parties to the action being the plaintiff and the defendant I. N. Van Nuys.

The complaint alleged the making of a contract, or water deed, on June 3, 1880, between James Foord of the first part and William H. Stephens, Kate W. Dobbins, Henry P. Tallant,

and V. S. Owen, of the second part, and the instrument was set out in full in the complaint.

It provided that in consideration of certain amounts of money which had been paid by the parties of the second part to the agreement, to said Foord (Stephens, $2000; Kate W. Dobbins $1714.28, and Tallant and Owen jointly $2285.73) "the said Foord does hereby grant, bargain, sell, and convey to the said parties of the second part, to be owned and held and enjoyed by them in proportion to their said respective payments and to their heirs, representatives, and assigns forever, all the water now flowing and hereafter to flow from three wells located on said grantor Foord's land in said county and hereinafter described (5 acres) the said wells being each found by driving into the ground an iron pipe of seven inches in diameter. Also the full and perfect right to conduct the water from said wells by means of pipes which shall be inserted into the said wells at a point not less than two feet nor more than three feet below the surface of the ground immediately around such well, and which conducting pipes shall be so inserted or attached as not to interfere with the free use of a sand pump in said wells, and as not to create a siphon."

Then follow provisions granting the right to the second parties to conduct their water-pipes to their tracts of land through the land of Foord, but at their own expense, and other provisions regarding said pipes, their repair and removal at the expense of the grantees all immaterial to the question of the construction of the contract here involved, so far as requiring any detailed statement.

It is then further provided in the contract that: "The grantor stipulates and covenants that the total quantity of water flowing from said three wells measures at this date more than 110,000 gallons in each successive twenty-four hours (measured by cubic feet and the gallon estimated at 231 cubic inches) and for himself, his heirs, representatives, and assigns, he covenants and agrees with the grantees, their heirs, representatives, and assigns, that if at any time or times hereafter the water flowing from said wells shall so decrease as to measure less than 105,000 gallons in each period of twenty-four hours and shall so continue for a period of thirty days, he and his said heirs, representatives, and assigns shall and will from the water rising or flowing from or upon said five acres, or

that can be developed or obtained from said five acres, immediately and at the expense of said grantor, his heirs, representatives, and assigns, increase the stream of water for the grantees to the flow of 110,000 gallons in each period of twenty-four hours so as to deliver to them the quantity stipulated for. But the grantor, his heirs, representatives, and assigns shall not be obliged to furnish and deliver to the grantees more than two thirds of all the water that may be flowing on or from said five acres, or that can be developed or obtained by putting down as many wells as can be safely made without interfering one with another, and to a depth of from twenty to fifty foot, at least one half of said wells to be fifty feet deep. Provided, however, that if at any time or times hereafter one third of all the water flowing or developed or to be developed in the manner aforesaid, and at the expense of the grantor, shall still fall short of 110,000 gallons in each twenty-four hours, and the grantor shall fail to furnish the grantees that quantity, then the grantees shall have the right to demand that of the said wells then on the said five-acre tract one or more shall be so deepened as to obtain such supply for the grantees and one third of the expense thus incurred shall be paid by the grantees, and the remainder by the grantor. And if in such case the grantor shall fail or refuse to make such deepening as would be necessary to furnish the grantees with the said 110,000 gallons in twenty-four hours, then the grantees shall have the right to enter upon said five acres and to make said deepening, and two thirds of the expense thereof shall be adjudged a legal charge against the grantor, his heirs, representatives, and assigns to the extent of the value of the said five acres of land and no further, and against said five acres of land and against whomsoever shall own the same or any part thereof and to the same extent and no further. And all the water so added to the flow up to the said 110,000 gallons for each twenty-four hours shall go and belong to the grantees, their heirs, representatives, and assigns in like manner and in the same proportions as the original quantity heretofore conveyed in the operative part of this conveyance. The grantor shall bear the expense of removing from said wells all accumulations of sand so far as may be necessary or desirable and of repairing and removing and renewing the pipes forming said wells, whenever necessary, and he shall do said

repairing, removing and renewing whenever necessary to the preservation of the flow of water."

Foord then covenants that all the property interests and rights conveyed to the parties of the second part and stipulations in their favor shall survive and pass to their heirs, representatives, and assigns; that the covenants and stipulations shall run with the said five acres of land and are declared a burden thereon and in whomsoever's hands the same may come, and that all persons who take said five acres, or any part thereof, shall be held personally responsible to the extent of the value of said five acres herein charged with the performance of all the covenants and stipulations made in favor of the parties of the second part. Then follows a description of the five acres of land, referred to as wholly swamp, with a particular description by monuments and distances of the exact location on the tract of the three wells mentioned in the contract or deed, followed by a final provision therein that the parties of the second part mentioned as grantees shall take as between themselves, their proper interests as tenants in common and not as partners, and in proportion to their said payments—Stephens seven twenty-first parts, Dobbins six twenty-first parts, and Tallant and Owen the remaining eight twenty-first parts.

The complaint after alleging that the contract above referred to was duly acknowledged by the parties thereto and recorded, proceeds to allege that plaintiff is, and for more than four years has been, the assignee of the interest therein reserved to said Henry P. Tallant and V. S. Owen, and to six seventeenths of the interest of said Kate W. Dobbins who still owns the remainder of her interest under said contract; that said defendant Van Nuys for more than four years last past has been the owner of the five-acre tract described in the contract as successor in interest of said James Foord, and has also acquired the interest reserved under the contract to said Wm. H. Stephens, and the whole of the latter has been merged into the fee; that the flow of the three wells mentioned in the contract gradually diminished and more than four years ago practically ceased; that plaintiff without objection from defendant up to a year last past made efforts to restore said flow by deepening said wells and by the use of a siphon, but without success; that beneath the surface of said five acres and reach-

ing within fifty feet thereof there exists a large body of water which, while it will no longer flow naturally to the surface through wells sunk therein, is capable of being developed by pumping and that by installing and operating pumping plants upon said five acres a quantity of water could be developed, one third of which would be equal to the quantity reserved to said grantees by said contract, and that this condition has existed at all times since the execution of the contract; that defendant Van Nuys has installed a pumping plant on said five acres and within the last four years has pumped a large quantity of water thereby but has failed to deliver any to the plaintiff under said contract; that in 1907 plaintiff undertook to install a pumping plant upon said five acres for the purpose of pumping water for his use but defendant Van Nuys objected and secured an injunction against the erection of said pumping plant by plaintiff; that when the above recited contract was executed each of the grantees therein was the owner of land in the vicinity of said five acres and said water was purchased for use on said lands respectively, and was so used as long as the same was furnished; that plaintiff now owns the land then owned by Tallant and Owen, and also six seventeenths of the land owned by said Kate W. Dobbins.

It is then alleged that plaintiff has expended a thousand dollars and upwards in attempting to obtain water due under said contract and a further sum of twelve hundred dollars in purchasing water elsewhere to supply his needs, and that by reason of lack of sufficient water his trees and crops have been damaged in the last four years to the extent of a thousand dollars and upwards; that all these damages accrued through the neglect and failure of the defendant Van Nuys to secure water upon said five acres by pumping in accordance with said contract, or to deliver water already secured by him through pumping.

The prayer of the complaint is for damages in the sum of thirty-two hundred dollars and a judgment that defendant Van Nuys be ordered to forthwith install and operate a pumping plant or plants upon said five acres sufficient to develop water to supply plaintiff with the proportion of water due him under the aforesaid contract, or to supply him with water from the pumping plants already installed, and that if defendant fails to comply with said order, a receiver be ap-

pointed to take possession of a sufficient portion of said five acres and supply water by pumping therefrom sufficient to supply plaintiff with the proportion due under said contract, the expense of said receivership to be borne by defendant Van Nuys and be a charge upon said five-acre tract.

The defendant demurred generally and specifically to the complaint. The demurrer was sustained and plaintiff declining to amend and electing to stand upon his pleading, the judgment from which he appeals was entered against him.

The only point involved on this appeal is the proper construction to be given to the contract, or water deed, upon which plaintiff bases his right of action, and this narrows down to what was the nature of the "development" of the water which Foord and his successors in interest agreed to make in order to keep the flow of water for the benefit of the grantees up to one hundred and ten thousand gallons at any time when the water flowing from said three wells so decreased as to measure a flow of less than one hundred and five thousand gallons.

In the contract Foord is uniformly designated as the grantor and the several parties who are given proportionate rights to the water mentioned therein are designated as the grantees, and these terms will be used by us in discussing the rights of the parties under the contract.

It is insisted on the part of appellant that by the terms of the contract Foord conveyed to the grantees, and covenanted to deliver to them, a specific quantity of one hundred and ten thousand gallons of water; that while it was provided in the first instance the supply should be furnished from the three wells then existing upon the five-acre tract, it was contemplated by the parties thereto that the flow therefrom might at some time diminish and in contemplation of this possibility Foord covenanted and agreed that if the quantity decreased to less than one hundred and five thousand gallons during a period of thirty days that he would "from the water rising or flowing from or upon said five acres, or that can be developed or obtained from said five acres" immediately at his own expense "increase the stream of water for the grantees to the flow of 110,000 gallons . . . so as to deliver them the quantity stipulated for"; that this contract to supply the decrease in the stipulated quantity from "water that can be developed or obtained from said five acres" is to be construed as a covenant

to develop water in any such manner as might secure the supply and that if by installing a pumping plant such supply can be secured, the covenants of Foord embrace such a method. In so insisting that this is the proper construction to be put upon the contract, appellant relies particularly on the case of *Garvey Water Co.* v. *Huntington etc. Imp. Co.*, 154 Cal. 232, [97 Pac. 428]. The trial court in sustaining the demurrer generally, necessarily held that the contract was not susceptible to this construction; that it did not provide or contemplate the development of water by the installation of a pumping plant when the amount supplied from the three wells decreased in flow, but solely a development whereby a natural artesian flow from the wells could be obtained.

In construing a contract the basic rule is to be adopted that each clause is to be considered with reference to every other clause upon which it has any bearing, and all the clauses and provisions are to be construed together as the unified medium whereby the intent of the parties to the instrument is to be reached, and this rule is to be applied here.

Appellant, as we have said, insists that under the grant from Foord there was conveyed to the grantees a specific quantity of water amounting to one hundred and ten thousand gallons during each twenty-four hours. This, however, is certainly not the fact as far as the operative part of the conveyance—the granting clause is concerned; no specific quantity is there mentioned, the amount being of all the waters of the three wells "now flowing or hereafter to flow" therefrom. Under this granting clause the grantees were entitled to no specific quantity of water; they were entitled to all the waters flowing therefrom whether the flow amounted to less than one hundred and ten thousand gallons or exceeded it.

In this connection, too, it is to be noticed as bearing materially on the construction to be placed on subsequent provisions of the contract that these wells were artesian wells. It is evident, not only from the use of the term "water now flowing or to flow" from the wells, but also from the manner in which the supply pipes of the grantees were to be connected with them—three feet below the surface—and this was the only method provided for obtaining the water.

Now, while it is clear that there is no conveyance of any specific quantity of water in the granting clause of the contract

it is insisted by appellant that a subsequent provision thereof amounts to such a grant. The provision on which this claim is based is the one where Foord covenanted that the quantity of water flowing from the three wells at the date of the contract measured more than one hundred and ten thousand gallons, and in which he agreed that if the flow decreased so as to measure less than one hundred and five thousand gallons, he would "from the waters rising or flowing from or upon said five acres, or that can be developed or obtained from said five acres" increase the flow to one hundred and ten thousand gallons. But this provision contains no grant of a specific quantity of water to the grantees either directly or inferentially. All that it amounts to is a covenant that at the date of the contract the wells to which the grantees acquired the entire flow of water therefrom flowed more than one hundred and ten thousand gallons, and that if it decreased the grantor would increase the flow up to one hundred and ten thousand gallons. That there was no definite or specific quantity of water is further apparent from the subsequent provision of the contract immediately following the one last referred to where it is provided that of the waters to be furnished from said five acres or that can "be developed or obtained" therefrom, the grantor shall not be required to furnish more than one third thereof. Under this provision as the flow from the three wells and the further quantity to be furnished by the grantor under the contract might be less than one hundred and ten thousand gallons, it is evident that no specific quantity of water was contracted to be furnished. What the grantor did convey was all the water flowing from the three wells whatever that amount might be, with an accompanying agreement that he would endeavor to keep that flow up to one hundred and ten thousand gallons by certain means to be taken by him for that purpose and to the extent of one third of the water obtained by such means, but this falls far short of a grant of a specific quantity of water.

Now as to the means which were to be employed by the grantor to provide the grantee with this quantity of water.

Appellant insists that it is a matter of common knowledge that the flow from wells and springs may not be permanent and as the five-acre tract contained a non-failing supply of water which, if it ceased to run by gravity or natural pressure,

could be by artificial means made to flow, the parties to the
contract must have had in contemplation a resort to such
means—that is pumping—if the natural flow from the wells
should cease; that the terms "developed," "obtain," and "in-
crease the stream of water" employed in the contract are words
and phrases capable of broad signification, and taken in con-
nection with the fact that the grantees paid a valuable con-
sideration for the water to be furnished them, as it is capable
of being furnished by the artificial means of pumping, there
is no reason why a construction to that effect should not be
given to the contract.

There would be much force in the position of appellant if,
after granting all the waters flowing from the three wells,
there was nothing further in the contract than an agreement
that if these wells failed to supply one hundred and ten thou-
sand gallons, that the grantor would "from the water rising
or flowing from or upon said five acres, or that can be devel-
oped or obtained from said five acres, immediately at his own
expense" increase the stream of water for the grantees to a
flow of one hundred and ten thousand gallons.

The difficulty, however, in giving to these terms of the agree-
ment the broad signification sought by appellant is found in
subsequent provisions of the contract immediately following
the clause above referred to defining just how the water to
keep up a supply of one hundred and ten thousand gallons is
"to be developed and obtained." In the first subsequent pro-
viso it is declared that the grantors shall not be obliged to
furnish the grantees more than one third of all the water that
"may be flowing on or from said five acres or that can be de-
veloped or obtained by putting down as many wells as can be
safely made . . . to a depth of from twenty to fifty foot, at
least one of said wells to be fifty feet deep."

Here the provision defines exactly how the water shall be
developed and obtained; it is to be by the sinking of a number
of shallow wells and by this means only. The parties evidently
contemplated that as the wells already sunk and the waters of
which the grantees were entitled, were of artesian flow, that in
case of a decrease in their supply, other wells sunk on the tract
would likewise produce an artesian flow. As such a result
would be obtained by simply sinking wells to open the artesian
flow, this affords an all sufficient reason why nothing was said

in the contract about pumping or the employment of mechanical or artificial means by the grantor to furnish the supply.

And that it was in contemplation of the parties that the sinking of these wells by the grantor would supply an artesian flow and that such sinking alone was to be the maximum work to be done by the grantor at his own expense, is very evident from the next following provision of the contract. This provision referred to was inserted on the theory that the sinking of the shallow wells might not produce an artesian flow so it was there provided that if after sinking them sufficient water was not developed to furnish the grantees with one hundred and ten thousand gallons, then the grantees might demand that one or more of the wells on the tract should be so deepened so as to obtain such supply for the grantees, the expense thereof to be borne by the grantor and the grantees in certain proportions. All that is required on the part of the grantor by the terms of the contract is the sinking of wells or the deepening thereof, and as to the last provision the only purpose of deepening the wells would be to obtain an artesian flow thereby. There is no suggestion in or inference to be drawn from any of these provisions that any artificial means to supply water was contemplated or provided for. What the parties had in mind when the contract speaks of water to "be developed or obtained" in the event the artesian flow in the three wells should decrease beyond a given quantity was the obtaining of an artesian supply by sinking other wells or deepening those that had been sunk. It is impossible to explain the entire absence in the contract of any mention of the use or employment of artificial means to furnish grantees water from the wells to be sunk or deepened, upon any other ground than that an artesian flow was all that was contemplated to be obtained by the particular means which it was provided that the grantor should adopt to secure the supply.

But as further confirming the fact that the parties were relying for the supply of water under the contract upon the development of an artesian flow by the sinking of the shallow additional wells or the deepening of them, is the fact that if the establishing of a pumping plant for the purpose was in contemplation by the parties no provision is made in the contract for the expense of installing, operating, and maintaining it.

In providing for what each was expressly to do under the contract the parties were very careful to stipulate as to who were to bear the expense or the proportions in which it was to be borne. To illustrate: The conducting pipes from the wells to the lands of the grantees were to be laid down, repaired, and renewed at the expense of the grantees; the expense of removing and repairing the casing pipe of any of the wells, the sinking of new wells and removing sand accumulations therefrom are to be borne by the grantor and the expense of deepening the wells should it become necessary are to be borne, two thirds by the grantor and one third by the grantees. All the work to which it should apply was particularly provided for, and the specifications of the contract in that regard are entirely consistent with the idea that what was intended in providing for the sinking of additional wells and deepening existing ones if the three original wells decreased in flow, was to obtain a similar flow such as had proceeded from the three wells,—namely, an artesian flow. If on the other hand, as contended by appellant, it was the intention of the parties if an artesian flow was not obtained by the means specified to be taken to accomplish that end that the artificial means of pumping was to be resorted to, then we have an absence in the contract of any provision for the payment of the expense thereof. It is to be noted that whatever rights the grantees acquired under the contract were not for any limited period but were perpetual. If the installing of a pumping plant was in contemplation of the parties, then necessarily there was a perpetual expense in its maintenance and operation, and, yet, not a word is said in the contract as to who shall bear this expense. In face of the fact that as to all operations or means which the contract specifically requires to be taken or done by either party to the contract, the expense of doing so is particularly imposed upon one or the other of the parties thereto, it is not within the realm of reasonable probability that if it were intended that a pumping plant should be established and maintained perpetually to obtain a flow of water that not a word should be said in the contract about the expense of its installation or operation or by whom the burden of that expense should be assumed. The entire absence of any such provision only strengthens the construction which the provisions of the contract disclose that resort to such artificial means as pump-

ing was not within the contemplation of the parties but that the only thing contemplated by the sinking of the shallow wells or the deepening of some of them was to obtain an artesian flow similar to that supplied by the three original wells and that the sinking of the shallow wells or on demand the deepening of some of them was the maximum of development and the kind of "development" work to be done by the grantor under the contract.

There is nothing in *Garvey Water Co.* v. *Huntington etc. Imp. Co.*, 154 Cal. 232, [97 Pac. 428], relied on by appellant which requires a different construction of the contract here under consideration. The contract in the Garvey case and the contract here are essentially different. In the Garvey case the Shorbs, owners of the Shorb Ranch, granted to Garvey a first or prior right to a full, uninterrupted, and perpetual flow of thirty inches of any water then or thereafter to be developed or flowing upon or from their lands. It was expressly covenanted that they did not warrant a continuance of the flow of thirty inches, but they did covenant that water was on the land and that it was their intention to continue to develop the flow therefrom, reserving the privilege of doing so by boring wells and driving tunnels and such other means as engineering skill might suggest; they further stipulated that if the flow of water then or thereafter developed upon the land should decrease so that Garvey should not receive the quantity granted that Shorb at the expense of Garvey would "do or perform such work towards restoring the flow of water as any competent engineer" that Garvey might select "shall direct to be done," the necessary money "to carry on such work of development" to be advanced by Garvey. It was held that under the last provision of the contract the installment of a pumping plant for the restoration of the supply of water from one of the artesian wells from which Garvey had been getting his specific quantity of water was "development work" within the meaning of the contract. There can be no question but that pumping is a means for the development of water and that as the Shorbs had agreed to do "such other work" as an engineer might determine would restore the development of the waters which Garvey was to receive, the determination of the engineer that a pumping plant should be installed for that purpose we held was in the contemplation of the parties "development

work." But here Foord had not agreed to be governed by the suggestion of anybody or to do anything upon such a suggestion. · The parties, as the contract shows, had in view the restoration of an artesian flow such as the original three wells were supplying under the contract so made. If this supply decreased, what Foord was to do to restore it to the grantees was clearly and definitely specified in the contract. He was simply to sink other shallow wells or deepen those already existing to the end that an artesian flow might be obtained. He did not stipulate that any other means would be taken by him for that purpose or that it should be left to anybody else to determine any other way in which it might be done, all of which distinguishes this contract from that under consideration in the Garvey case.

Under this construction of the contract between the parties the complaint stated no cause of action against the defendant thereunder, and, hence, the demurrer was properly sustained.

The judgment and order appealed from are affirmed.

Melvin, J., and Henshaw, J., concurred.