[Civ. No. 4847. Second Appellate District, Division One.—May 20, 1927.]

## CLARENCE L. CHRISMAN, Respondent, v. SOUTHERN CALIFORNIA EDISON COMPANY (a Corporation), Appellant.

[1] CONTRACTS — OPTION—CONSIDERATION—MUTUALITY.—Under section 1605 of the Civil Code, defining a good consideration, a consideration of one dollar supplies mutuality of obligation to a contract in the nature of an option to purchase water for irrigation.

[2] ID. — CONSIDERATION — EVIDENCE. — It is a matter of common knowledge that where a consideration of one dollar is mentioned in a contract, other considerations usually pass between the parties to the agreement.

[3] ID.—AMOUNT OF CONSIDERATION—ADEQUACY.—Where the promisor is not otherwise entitled to the amount of the consideration it is sufficient to sustain the contract, though of trifling amount; the question of its adequacy being determined by the contracting parties.

[4] ID. — OPTION—PURCHASE OF WATER FOR IRRIGATION — CONSIDERATION. —An option agreement for the purchase of water for irrigation, although in its nature unilateral, is as binding upon the part of the optioner as is a bilateral agreement upon the parties thereto, when supported by a valuable consideration, whether such consideration is adequate in amount or not.

[5] ID. — UNILATERAL CONTRACT—MUTUALITY.—The doctrine of mutuality is inapplicable to a unilateral contract, since such contract is not founded on mutual promises.

[6] WATERS AND WATER RIGHTS — IRRIGATION—CONTRACTS—OPTION.— An option contract for the purchase of water for irrigation, supported by a consideration of one dollar, binding defendant to deliver water on demand, was no longer unilateral on demand being made, and plaintiff became liable under the contract to take and pay for all water necessary for irrigation purposes as demanded.

[7] ID. — CONTRACT TO FURNISH WATER — CERTAINTY AS TO TERMS — CONSTRUCTION. — In an action for damages for failure to furnish

---

1. Recital in instrument of one dollar as sufficient valuable consideration, note, Ann. Cas. 1912B, 363.
3. See 6 Cal. Jur. 169, 189; 6 R. C. L. 678.
5. See 6 Cal. Jur. 213; 6 R. C. L. 687.
6. See 6 Cal. Jur. 214; 6 R. C. L. 687.

water for irrigation, the contract pleaded, which provided that the user of water agrees to pay for it at the rate of twenty-five cents per inch each twenty-four hours, and defining an' inch at thirteen thousand gallons, was not void for want of certainty.

[8] ID. — CONTROL OR POSSESSION OF WATER AVAILABLE FOR DISTRIBUTION — SUFFICIENCY OF ALLEGATIONS — PLEADING.—In such action, an allegation in the complaint that defendant was the owner of water appurtenant to the land described in an amount sufficient to supply the demand for irrigation was sufficient, as against a motion for judgment on the pleadings, to allege that defendant had in its control or possession appurtenant water available for distribution.

[9] ID. — PLEADING — OWNERSHIP OF WATER—DEVELOPMENT OF WATER SUPPLY—INFERENCES.—In such action, the allegation of ownership of water appurtenant to land in an amount sufficient to supply the necessary and convenient demand for irrigation of such land, and in an amount more than sufficient to supply said land *pro rata* of the acreage in the order of which the land was entitled to water, necessarily implies that such water supply already had been developed.

[10] ID. — ASSUMPTION OF OBLIGATIONS OF AGREEMENTS TO FURNISH WATER — PLEADING — DEMURRERS. — In such action, an amended complaint containing allegations as to agreements between the predecessors in interest of plaintiff and of defendant, and as to defendant's purchase of predecessors' property and property rights, was not demurrable as being uncertain and unintelligible for failure to show whether defendant assumed the obligations of the agreements.

[11] ID. — PURCHASE OF EXISTING WATER RIGHTS — OBLIGATION TO DELIVER WATER. — In such action, the defendant company by purchasing all of the property and property rights of a power company, including the water appurtenant to the land of plaintiff, purchased such water subject to any existing rights to the use thereof, and purchased the water distributing system with the obligation to continue to serve the consumers previously receiving service therefrom, even though such obligation was not expressly assumed.

[12] ID. — WATER FOR IRRIGATION PURPOSES — RIGHT TO USE — REAL PROPERTY.—The right to water to be used for irrigation purposes is a right in real property.

[13] ID. — PLEADING—AGREEMENT TO SUPPLY WATER—USE OF DISTRIBUTING SYSTEM.—In this action for damages for failure to furnish water for irrigation, the complaint which alleged an agreement to

11.  See 15 R. C. L. 476.
12.  See 25 Cal. Jur. 1031, 1032.

furnish water by defendant's predecessor in interest and defendant's purchase of such predecessor's property and property rights, including a distributing system, sufficiently alleged that the distributing system sold to defendant was the one used by the predecessor in supplying water under such contracts.

[14] ID. — OWNERSHIP OF WATER — RESERVATION OF USE—EVIDENCE—FINDINGS.—In such action, the evidence was sufficient to support the finding that defendant purchased and owned water appurtenant to plaintiff's lands, although the use of said water was reserved to the benefit of purchasers of lands from plaintiff's predecessor in interest.

[15] ID. — OBLIGATION TO FURNISH WATER — EVIDENCE—FINDINGS.—In such action, the evidence was sufficient to support the finding that defendant purchased from a predecessor in interest a distributing system serving plaintiff's lands, and the rights and obligations under such predecessor's agreements to furnish water, although defendant did not expressly assume the obligation to continue to serve the consumers previously receiving service.

[16] ID. — SUFFICIENCY OF WATER SUPPLY — EVIDENCE—FINDINGS.—In such action, the evidence was sufficient to support a finding that there was available to defendant sufficient appurtenant water to use in the irrigation of plaintiff's lands.

[17] ID. — CONTRACTS—AGREEMENT TO DELIVER WATER FOR IRRIGATION — DEVELOPMENT OF WATER SUPPLY — CONSTRUCTION. — In such action, under agreement by defendant's predecessor in interest to deliver "all the water necessary and convenient for the irrigation of and being appurtenant to" certain lands for a period of fifty years, defendant had the right to develop and maintain the existing water supply, such contracts not being limited to flowing waters.

[18] ID.—DEVELOPMENT OF WATER SUPPLY—EVIDENCE—FINDINGS.—In such action, the evidence was sufficient to support the findings of the trial court that defendant could have developed water at a certain well site in an amount sufficient to supply the necessary and convenient demands for the irrigation of plaintiff's land and more than sufficient to supply said land *pro rata* of its acreage, and it was incumbent on defendant to meet such evidence by affirmative evidence showing that it had attempted to develop such amount of water and that it could not be developed.

[19] ID. — APPURTENANT WATERS — EVIDENCE—FINDINGS.—In such action, defendant was in no position to urge the objection that the evidence was insufficient to support the finding that there was any appurtenant water, where its predecessor in interest entered into

17. See 26 Cal. Jur. 231.

an agreement providing that a certain well site and all subterranean waters were appurtenant.

[20] ID.—FAILURE TO DISTRIBUTE WATER—DAMAGES.—In such action, the proper measure of damages was the loss of plaintiff's crops as a result of lack of irrigation, less the cost of production and the net value of crops actually produced, although plaintiff had 150 inches of water of his own, where defendant refused to distribute such water, since under such circumstances the water was not available to plaintiff.

[21] ID. — DAMAGES—VALUE OF CROP — EVIDENCE.—In such action, the trial court did not err in admitting evidence of the value of the crop plaintiff might have raised under irrigation.

[22] ID. — SOURCE OF WATER SUPPLY — EVIDENCE.—In such action, the trial court properly admitted evidence that a certain well site could have furnished sufficient water for irrigating lands described in the agreements sued on, where such water was appurtenant to plaintiff's land and there was no testimony of demands by other owners for such water.

[23] ID. — AMOUNT OF WATER SUPPLIED — FINDINGS—JUDGMENTS.—In such action, the findings were sufficient to support the judgment for plaintiff as against defendant's contention that there was no finding with reference to what amount of water was necessary or convenient for the irrigation of plaintiff's lands.

---

(1) 13 C. J., p. 365, n. 66.    (2) 23 C. J., p. 76, n. 73.    (4) 13 C. J., p. 336, n. 51.    (5) 13 C. J., p. 332, n. 20.    (6) 40 Cyc., p. 834, n. 34.    (7) 40 Cyc., p. 834, n. 36.    (8) 40 Cyc., p. 840, n. 84.    (11) 40 Cyc., p. 833, n. 33.    (12) 40 Cyc., p. 829, n. 7.    (14) 40 Cyc., p. 840, n. 86.    (17) 40 Cyc., p. 834, n. 35.    (20) 40 Cyc., p. 840, n. 90.    (21) 40 Cyc., p. 840, n. 85.

APPEAL from a judgment of the Superior Court of Ventura County. Franklin J. Cole, Judge. Affirmed.

The facts are stated in the opinion of the court.

Roy V. Reppy, E. W. Cunningham and Robert M. Clarke for Appellant.

Bowker & Sheridan for Respondent.

---

20. Measure of damages for breach of contract to furnish water for irrigation, notes, 19 L. R. A. (N. S.) 938; 31 L. R. A. (N. S.) 743. See, also, 26 Cal. Jur. 556; 15 R. C. L. 482.

McLUCAS, J., *pro tem.*—Plaintiff brought suit for damages alleged to have been sustained by reason of the failure and neglect of the defendant to furnish necessary water for the irrigation of certain lands of the plaintiff. Defendant appeals from a judgment rendered for plaintiff.

Before any evidence was taken defendant moved for judgment on the pleadings and for dismissal of the action on the ground that the amended complaint did not state facts sufficient to constitute a cause of action in that the agreements attached to and made a part of the amended complaint are each of them void for want of mutuality and void for want of certainty. The obligation to deliver water under the four separate agreements sued upon is typified by the language used in the contract set up as exhibit "A" attached to the amended complaint, and is as follows: "That the party of the first part, for and in consideration of the sum of one dollar to it paid and of the covenants and agreements on the part of the party of the second part hereinafter contained, agrees to deliver through its distributing system, to the party of the second part, when demanded, on fifteen days' notice, *pro rata* of the acreage, in the order of distribution to which the land is entitled to water, under the rules and regulations of the party of the first part, all the water necessary and convenient for the irrigation of and being appurtenant to the following described land." The undertaking with reference to the taking of and payment for the water is as follows: "The party of the second part hereby agrees to pay to the party of the first part for all water delivered to him from the distributing system of the party of the first part, at the rate of twenty-five (25) cents per inch of thirteen thousand (13,000) gallons of water each twenty-four (24) hours, all payments for the distributing of water to be made within thirty (30) days from and after the delivery thereof, in gold coin of the United States." The agreement provides that it shall continue in full force for fifty years from January 1, 1906, and shall apply to and bind the successors and assigns of the respective parties thereto. Appellant asserts that the contracts lack mutuality in that the seller is obligated to furnish water, but there is no corresponding obligation on the buyer to take any water. The case of *Schimmel* v. *Martin,* 190 Cal. 429 [213 Pac. 33], is

cited, where the court says: "The contract is lacking in mutuality. Considered as a contract for the sale of personal property, as the parties to the action treated and considered it, and as the trial court in effect found it to be, there is clearly no mutuality in the absence of an agreement by the plaintiffs to buy the water offered for sale by the contract." [1] But the foregoing case is to be distinguished from the case at bar in that no consideration whatever is mentioned in the contract then before the court. In the present case, a consideration of one dollar is named in the agreement. Consideration supplies mutuality of obligation to the contract. Section 1605 of the Civil Code defines a good consideration as follows: "Any benefit conferred, or agreed to be conferred, upon the promisor, by any other person, to which the promisor is not lawfully entitled, or any prejudice suffered, or agreed to be suffered, by such person, other than such as he is at the time of consent lawfully bound to suffer, as an inducement to the promisor, is a good consideration for a promise." In the instant case there was a valuable consideration for the making and entering into the contract. [2] It is a matter of common knowledge that where a consideration of one dollar is mentioned in a contract, other considerations usually pass between the parties to the agreement. A consideration of one dollar is ordinarily sufficient to support a contract at law. (*Smith* v. *Bangham,* 156 Cal. 359 [28 L. R. A. (N. S.) 522, 104 Pac. 689].) It has been decided that an option given for twenty-five cents is not without adequate consideration. (*Marsh* v. *Lott,* 8 Cal. App. 384 [97 Pac. 163.].) [3] The benefit may be trifling, but if the promisor is not otherwise lawfully entitled to it, it is sufficient to sustain the contract as a matter of law. The law does not weigh the *quantum* of the consideration. (6 Cal. Jur., p. 169.) If the amount named is not adequate the vendor should so determine in his own mind before he signs the contract, but having signed it, he must live up to his agreement. Any other rule would make the contract worthless and mere waste paper. (6 Cal. Jur., p. 189; *Bird* v. *Potter,* 146 Cal. 286 [79 Pac. 970].) The contract in the present case is in the nature of an option to purchase personal property. The rule seems to be that any money or other valuable thing, however small, moving from the optionee to the optioner for an option to

purchase property at its adequate value is sufficient to render the option binding upon the optioner for the time specified. **[4]** An option agreement, although in its nature unilateral, is as binding upon the part of the optioner as is a bilateral agreement upon the parties thereto, when supported by a valuable consideration, whether such consideration is adequate in amount or not. (*Braselton* v. *Vokal*, 53 Cal. App. 582 [200 Pac. 670].) **[5]** As a unilateral contract is not founded on mutual promises, the doctrine of mutuality of obligation is inapplicable to such a contract. (*Nevada Bank* v. *Steinmitz*, 64 Cal. 301 [30 Pac. 970]; *Mathewson* v. *Fitch*, 22 Cal. 86.) **[6]** In the case at bar the complaint alleges an option given by defendant's predecessor in interest to plaintiff's predecessor in interest, agreeing to deliver water for irrigation purposes, when demanded, at a certain price, and that plaintiff made demand for said water for irrigation purposes as provided in said contract. Upon demand being made, the contract was no longer unilateral and plaintiff became liable under the contract to take and pay for all the water necessary for irrigation purposes, as demanded. All that was required of plaintiff to exercise the option and accept the offer contained in the option contract was to make the demand for water as provided in the contract. In *Flickinger* v. *Heck*, 187 Cal. 111 [200 Pac. 1045], the court says: "An option contract may be regarded as embodying an offer. When the optionee, or person to whom the offer is made, signifies his desire to accept in accordance with the terms of the option, the optioner, or person making the offer, becomes obligated to perform. This acceptance of the offer contained in the option contract is called 'election' and it gives rise to a subsequent contract between the parties to buy or sell, or perform whatever other acts have been specified in the option contract. (*Pennsylvania Min. Co.* v. *Smith*, 207 Pa. St. 210 [56 Atl. 426].) 'The particular act or acts which constitute an election may be fixed by the terms of the option, as also the time when, the place where, and the person to whom it shall be made.' (James on Law of Option Contracts, secs. 801, 817.) The language of the contract itself controls as to what act or acts constitutes an election. Under the terms of one option, election may consist of a tender of the property to be sold or purchase price to be paid; under the

terms of another option, it may consist of a mere notice of election to purchase or sell, leaving payment of the price and delivery of the property as subsequent matters in performance of the executory contract raised by the election. (*Breen* v. *Mayne,* 141 Iowa, 399 [118 N. W. 441]; *Byers* v. *Denver Circle R. Co.,* 13 Colo. 552 [22 Pac. 951]; James on Law of Election Contracts, sec. 817.) If the tender of property or purchase price constitutes an 'election,' it must be performed in order to turn the offer contained in the option contract into a contractual obligation and, if not performed as provided in the option contract, no subsequent contractual liability arises; if the tender is merely in performance of the contract created by a notice of election, it is controlled by the terms of that contract and 'in the absence of anything in the contract itself, the obligation of the parties in the performance of the contract is governed by the law applying generally to bilateral contracts for the purchase and sale of property. . . . ' (*Cates* v. *McNeil,* 169 Cal. 697 [147 Pac. 944].) ''

In *Feisthamel* v. *Campbell,* 55 Cal. App. 774 [205 Pac. 25], it is said: ''An option agreement, supported by sufficient consideration, is an enforceable contract, notwithstanding its unilateral character, and the question of want of mutuality of remedy does not affect it. 'If mutuality, in a broad sense, were held to be an essential element of every valid contract, to the extent that both contracting parties could sue on it, there could be no such thing as a valid unilateral or option contract, or a contract evidenced by a subscription paper, or a contract to enforce a reward offer, or a guaranty, or in many other instances readily put in ordinary business affairs. . . . An option, supported by a consideration, furnishes another illustration of a contract which is valid, notwithstanding the lack of mutuality. It is no objection to the validity of the contract that the holder of the option is under no obligation to exercise it.' (6 Ruling Case Law, p. 687, and decisions shown in footnote. See, also, *Pittsburg Vitrified P. & B. Co.* v. *Bailey,* 76 Kan. 42 [12 L. R. A. (N. S.) 745, 90 Pac. 803].) ''

Since the contract pleaded in the complaint was an option agreement supported by sufficient consideration, it was, in our opinion, an enforceable contract and was valid, notwithstanding the lack of mutuality.

[7]   Appellant's contention that the contract pleaded is void for want of certainty is without merit.   Under the terms of the contract, the user agrees to pay for water at the rate of twenty-five cents per inch each twenty-four hours, and an inch is defined as 13,000 gallons.

[8]   Appellant claims there is no allegation in the complaint that defendant had in its control or possession appurtenant water available for distribution under the agreements mentioned.   The complaint alleges: "That at all times herein mentioned said defendant was the owner of water appurtenant to the land hereinbefore described in an amount sufficient to supply the necessary and convenient demand for the irrigation of said land, and in an amount more than sufficient to supply said land *pro rata* of its acreage in the order of distribution to which said land was entitled to water."   Since an owner is ordinarily entitled to control and possession, we think that the foregoing is a sufficient allegation, as against a motion for judgment on the pleadings, that the defendant had in its control or possession appurtenant water available for distribution under said agreements.   As opposed to this allegation, defendant's authorities to the effect that an agreement to deliver water does not include an agreement to develop water are beside the point.   It remains to be determined by the proof offered whether development of additional water was necessary.   [9] Ownership of water appurtenant to land in an amount sufficient to supply the necessary and convenient demand for irrigation of said land, and in an amount more than sufficient to supply said land *pro rata* of the acreage in the order of which said land was entitled to water, necessarily implies that such water supply had already been developed.

[10]   Defendant demurred specially to the amended complaint and each cause of action therein on the ground that they were uncertain and unintelligible for the reason that it cannot be ascertained whether the defendant assumed any of the obligations referred to in the agreements.   The complaint alleges that plaintiff is the owner and in possession of certain lands; that certain agreements in writing were executed and delivered by and between the Ventura County Power Company and plaintiff's predecessor in interest; that said agreements were duly recorded; that in and by said agreements the Ventura County Power Company agreed to

83 Cal. App.—17

furnish water to plaintiff's predecessors in interest for the purpose of irrigating said lands, as set forth in the agreements attached thereto and made a part thereof; that plaintiff was the owner of and entitled to all the benefits under said contracts; that defendant purchased of and from the Ventura County Power Company all of its property and property rights, including the water appurtenant to said land and all the water and water rights in and to the Ventura River, together with its distributing system, including said agreements between Ventura County Power Company and plaintiff's predecessors in interest; that defendant is the successor in interest of Ventura County Power Company in and to said water rights, distributing system, and the contracts referred to. We think that the demurrer was not well taken. [11] When defendant purchased, as alleged, all of the property and property rights of Ventura County Power Company, including the water appurtenant to the land of plaintiff, it purchased said water subject to any existing rights to the use of said water. [12] The right to water to be used for irrigation purposes is a right in real property. (*Schimmel* v. *Martin*, 190 Cal. 429 [213 Pac. 33]; *Stanislaus Water Co.* v. *Bachman*, 152 Cal. 716 [15 L. R. A. (N. S.) 359, 93 Pac. 858]; *Copeland* v. *Fairview Land etc. Co.*, 165 Cal. 148 [131 Pac. 119].) The purchaser of a water distributing system is under obligation to continue to serve the consumers previously receiving service therefrom, even though he does not expressly assume that obligation. (*Hunt* v. *Jones*, 149 Cal. 297 [86 Pac. 686]; *Telander* v. *Tujunga Water & Power Co.*, 43 Cal. App. 492 [185 Pac. 504].)

[13] Appellant contends that it does not appear from the complaint that the Power Company ever had a distributing system by means of which water was delivered to plaintiff's land, or that this distributing system, if it existed, was sold by the Power Company to defendant. In other words, that there is nothing in the complaint to justify the inference or conclusion that the distributing system sold to defendant was the one used by the Power Company in supplying water under these contracts. We cannot agree with this contention. It expressly appears from the foregoing analysis that the complaint alleges that the Power Company agreed to furnish and distribute "all the water

necessary and convenient for the irrigation of and being appurtenant to" said lands. The complaint further alleges that the defendant purchased from the Power Company all of its property and property rights of every nature, kind, and character, together with its distributing system, including said agreements to distribute water. This necessarily included the distributing system which served the plaintiff under these contracts.

It appears from the evidence that on October 31, 1906, an agreement was made between the San Miguel Company and the Ventura County Power Company wherein it was recited that a resolution had been adopted on the same date at a meeting of the board of directors of the San Miguel Company, stating it to be the purpose of the San Miguel Company to improve by irrigation the lands now owned by it and described as the west one-half of the Rancho San Miguel in Ventura County, California; and to that end it reserved and retained unto itself all the water and water rights lying beneath the surface of said lands for the purpose of distribution of said water to the said lands as appurtenant thereto; and to apportion and distribute such water as may be necessary for the irrigation from a common source of wells or works of such subdivisions of land as may be conveyed by the corporation from time to time, and for the benefit of all of said land. The resolution further recited that it was necessary to apportion and distribute to purchasers of parcels of said land the water to which they were entitled as appurtenant to the land purchased. The resolution provided that the San Miguel Company should sell to the Ventura County Power Company such land as might be determined upon by the board of directors of the contracting corporations, "together with the wells now constructed and being upon said lands, reserving and retaining unto the San Miguel Company, and to its successors, assigns and grantees, all the right, title, property and interest in and to all the water and water rights lying and being beneath the surface of the land that will be conveyed by authority of this resolution, together with all the water flowing from and to hereafter flow from said wells, and to all the water that may flow from any and all wells that may hereafter be constructed upon said lands, as a water right appurtenant to all that certain parcel of land situated in

Ventura county, California, known and designated as the
west one-half of the Rancho San Miguel.'' It was further
resolved that the San Miguel Company transfer to the
Ventura County Power Company ''all the pipe lines now
constructed upon the land above described, with the electric
motors, pumps, fittings and belongings, as now existing,
granting to the Ventura County Power Company the right,
and the Ventura County Power Company accepting the ob-
ligation, to distribute to the San Miguel Company, its suc-
cessors, assigns and grantees, all the water appurtenant to
the land as hereinbefore declared, when demanded for the
irrigation of said land, under such agreements and condi-
tions as will make the distribution of said appurtenant water
fair and equitable to all the land herein described.'' The
resolution further authorized the officers of the San Miguel
Company to execute to the Ventura Company ''a deed of
the land purchased, or such agreement of sale as may be
determined upon, and further, to sell, assign, transfer and
convey all the right, title and interest of this corporation
in and to the pipe lines, electric motors, pumps, fittings and
belongings above named, upon the Ventura County Power
Company executing a proper agreement that it will dis-
tribute the water appurtenant to the west one-half of the
Rancho San Miguel, as hereinabove stated.'' Pursuant to
the foregoing resolution, the agreement further provides, in
consideration of the sum of ten dollars, and in consideration
of a certain agreement of sale and purchase between the
parties of certain land situated in the west one-half of the
Rancho San Miguel, together with the wells constructed upon
said land, and of the covenants and agreements therein set
forth, ''said agreement bearing even date herewith,'' the
San Miguel Company does sell to the Ventura County Power
Company all of the pipe-lines now constructed upon the
west one-half of the Rancho San Miguel, with the electric
motors, pumps, fittings and belongings, with the rights of
way for said pipe-lines, as now situated upon said ranch,
and the right of way for pipe-lines along the roads now
delineated upon the map of the land hereinbefore mentioned;
also the right to lay water conduits beneath the surface of
the land. The San Miguel Company reserves unto itself,
its successors and assigns, ''all the right, title, property and
interest in and to all the water and water rights lying and

being beneath the surface of that tract of land known as
the west one-half of the Rancho San Miguel, as hereinbefore
described, together with all the water flowing from and here-
after to flow from the wells now constructed and being upon
said ranch, and hereby declares such water and water rights
appurtenant to the land above described.'' The San Miguel
Company further granted to the Ventura Company ''the
right to distribute through pipe lines and conduits water
*from* (for) the irrigation of said land, under such agree-
ments, rules and regulations as will make the distribution
of said appurtenant water fair and equitable to all the land
herein described, whether as a whole or in subdivisions of
whatever area, at such price as may be determined upon.''
The Ventura County Power Company agreed for itself, its
successors and assigns, to ''accept the property above men-
tioned, with the privileges and rights of way particularly
described, and upon the conditions and reservations above
set forth; and does, for itself, its successors and assigns,
hereby agree that it will at all times distribute the water
flowing from the wells above mentioned to the land herein-
above described for purposes of irrigation of said land, and
as appurtenant thereto all the water flowing from said wells,
as demanded by the holders of land within the boundaries
above set forth, under such agreements, rules and conditions
as will apportion the distribution of said appurtenant water
fairly and equitably to all the land herein described, at such
price as may be determined upon.'' The instrument con-
cludes: ''To have and to hold all and singular the above
described property, rights of way and privileges, unto the
said Ventura County Power Company, and to its successors
and assigns, for the term of fifty years from and after the
date hereof.'' This instrument was recorded November 7,
1906, in the Ventura County recorder's office.

On November 1, 1906, the Ventura County Power Com-
pany entered into an agreement with the Buena Ventura
Company whereby the Power Company, ''in consideration
of the sum of one dollar to it paid and of the covenants and
agreements on the *party* of the party of the second part
hereinafter contained, agrees to deliver through its dis-
tributing system, to the party of the second part, . . . when
demanded, on fifteen days' notice, all the water necessary
and convenient for the irrigation of and being appurtenant

to the following described land, situate in the west one-half of the Rancho San Miguel, county of Ventura, state of California, being a part of Subdivision No. 1 of said ranch, . . . and containing 42.46 acres of land.'' The Power Company ''reserves the right to furnish to the party of the second part, for purposes of irrigation of the land above described, the water appurtenant to said land from the wells or works situate and being on the west one-half of the Rancho San Miguel, or from any other source of water supply owned and controlled by the party of the first part, when water from such supply may be had.'' The party of the second part ''agrees to pay the party of the first part for all water delivered to it from the distributing system of the party of the first part, at the rate of twenty-five (25) cents per inch of thirteen thousand (13,000) gallons of water each twenty-four (24) hours.'' The agreement was to continue in force for the term of fifty years from and after January 1, 1906, and was to bind the successors and assigns of the respective parties.

On November 20, 1906, an agreement similar in terms was entered into between the Power Company and C. L. Chrisman covering a portion of the west one-half of the Rancho San Miguel, containing 77.12 acres.

On July 25, 1907, the Power Company entered into a similar agreement with Mark McLoughlin covering a parcel of land in the west one-half of the Rancho San Miguel, containing 140 acres.

On August 1, 1907, the Power Company entered into another agreement with G. J. and Thomas Mullis, which in substance was the same as the other agreements, covering a parcel of land containing 25 acres in the west one-half of the Rancho San Miguel.

At the time of the execution of the agreement between the San Miguel Company and the Ventura County Power Company two wells were located on the west one-half of the Rancho San Miguel on a parcel of land containing 3.44 acres, referred to as the Beach well site. The Beach well site remained the property of the San Miguel Company until July 15, 1916, on which date it was conveyed to the Power Company. The conveyance was unqualified in terms, making no reservation of any water or water rights. This conveyance also included all pipe-lines upon the west one-half

of the Rancho San Miguel, together with all necessary right of entry and of way to repair, renew, and maintain said pipe-lines.   This deed recited that it was made pursuant to a resolution of the board of directors of the San Miguel Company.   The resolution was passed September 22, 1906, and authorized the officers of the company to sell all or any part of the west one-half of the Rancho San Miguel for such prices and upon such terms and conditions as they might deem proper for the benefit and advantage of the corporation.   On November 19, 1917, the Power Company conveyed all of its property to the defendant for valuable consideration.   Prior to the year 1920 the plaintiff had become the owner of the Buena Ventura tract and the Mullis tract, and was occupying the Chrisman tract under a lease. He had also entered into a contract to purchase the McLoughlin tract and the McLoughlin agreement with the Power Company.   Plaintiff also showed that he had received an assignment of the Buena Ventura and the Mullis agreements.

In the year 1920 the plaintiff planted lima beans on the Chrisman, Buena Ventura, Mullis, and McLoughlin tracts. The rainfall for the season of 1919–20 had been short, and it was necessary to irrigate the lima beans in order to produce a full crop.   On or about the second day of June, 1920, plaintiff caused written demands to be served upon the defendant, in which he claimed to be entitled to receive water under the Chrisman, Mullis, McLoughlin, and Buena Ventura agreements, and requested and demanded water for irrigation purposes to be delivered on the lands described in those agreements; the demand being for "all water necessary and convenient for the irrigation of the within described real property."   The defendant furnished no water from the Beach well system to plaintiff in response to these demands.   It did, however, furnish from the Mound system, from water not appurtenant to the lands herein mentioned, to the Chrisman tract of 77 acres an amount of water described by the plaintiff as 210 inches.   Plaintiff stated that he should have had 1,200 inches more on the 77-acre tract, 2,400 inches on the McLoughlin tract of 140 acres, 500 inches for the Mullis tract of 25 acres, and 600 or 700 inches for the Buena Ventura tract of 40 acres.   He testified that it would take at least 12 inches to the acre, if not more, at

the very minimum. Plaintiff testified that in 1920 he had two wells on the west one-half of the Rancho San Miguel which would have produced a flow of 150 inches; that he offered to allow the defendant to take this water for the purpose of supplying his demands for water on the four parcels of land upon which he was raising lima beans, but that the engineer of the water department of the defendant company, sent by the vice-president of the defendant to investigate and report on the matter, said that "he was afraid that might complicate matters with them, and it might make them under obligation to furnish it in the future, and they might recognize the contracts in question here by doing so."

The Beach wells were originally artesian flowing wells and had been in existence some time prior to the date of the execution of the agreement between the San Miguel Company and the Power Company. The flow from these wells is estimated to have been about 75 inches in 1903, but in 1908 and 1909, even when pumped, produced from 45 to 50 inches, according to the testimony offered by defendant. Plaintiff testified that he received water from the Beach wells when these contracts were first made, and that the last water received from the Beach wells was possibly in 1914 or 1915. James P. McLoughlin testified that water from the Beach wells was delivered on the McLoughlin tract for four or five years after the making of the contract. G. J. Mullis testified that water was furnished to the plaintiff as his tenant to the year 1908. C. F. Zapf, who was in charge of operation of the water properties of the Power Company and of the defendant, testified that he pumped water from the Beach wells in 1908, but that in 1909 a futile attempt was made to clean out the wells, and that to his knowledge no further attempt was made to get water from the wells. The meter readings of the electric meters of the Power Company show no consumption of electricity by the motor operating the pump at the Beach well site after August 25, 1909. According to Mr. Zapf, the supply of water at the Beach well site in 1908 was fairly good the first part of the season, but during June and July it gradually diminished and the wells were gradually sanding up. The books of the Ventura County Power Company show charges for the delivery of water to the owners of the lands

covered by this suit in the years 1907, 1908, 1911, 1912, 1913, 1914, 1915, and 1916. After deliveries from the Beach wells had ceased, water was delivered by the Power Company and the defendant on the lands described in the agreement sued upon through the Mound water system.

Testimony was offered by the plaintiff tending to show that numerous wells had been drilled in the vicinity of the Beach well site, producing water more than sufficient to irrigate the plaintiff's land properly, although defendant's testimony tended to show that the water level would be affected by the pumping of other wells in the same district.

[14] Under this state of the record defendant asserts that the findings are not supported by the evidence in five different respects. First, defendant claims that it did not purchase nor at any time own water appurtenant to the plaintiff's lands. The record shows that defendant purchased the Beach well site from the Power Company, which had purchased the same from the San Miguel Company in 1916, ten years after the Power Company and the San Miguel Company had entered into an agreement providing for the distribution of this water over the west one-half of the Rancho San Miguel, which the San Miguel Company proposed to subdivide, and in which agreement the San Miguel Company reserved all of said water as appurtenant to such land. During the interim the land was subdivided and sold, and the Power Company entered into contracts with the buyers to distribute the water to the lands so sold. The Power Company could not escape its liability under these contracts by permitting the wells to sand up and the pipes to become in a disusable condition so that it was necessary to supply water from another source of supply, as it had the right to do under the agreements with the land owners, and then accept an absolute deed to the well site and claim it was freed from all obligations to deliver water when there was a shortage of supply from the additional source so substituted. Defendant says that it is impossible for defendant to own water appurtenant to plaintiff's land. Defendant owned the Beach well site and the distributing system subject to all the obligations of the Power Company to distribute the water to said lands. (*Hunt* v. *Jones, supra; Telander* v. *Tujunga Water & Power Co., supra.*) Defendant thus had the obligation to distribute and owned the right

of possession and control of said water apurtenant to said lands. It had the control and possession of these waters, although their use was reserved to the benefit of the purchasers of the land from the San Miguel Company, notwithstanding the fact that the San Miguel Company attempted to convey the well site to the Power Company by absolute deed in 1916.

[15] Defendant next attacks the findings on the ground that the evidence shows that the defendant did not purchase from the Power Company the distributing system serving plaintiff's lands, nor the Power Company's rights and obligations under the agreements sued upon, and is not the successor in interest of the Power Company. As already stated, the defendant purchased the Beach well site, and in so purchasing all the property of the Power Company, including the distributing system, the defendant was under obligation to continue to serve the consumers previously receiving service therefrom, although it does not expressly assume that obligation. (*Hunt* v. *Jones, supra; Telander* v. *Tujunga Water & Power Co., supra.*)

[16] Defendant further criticises the findings in that the evidence shows that there was not available to defendant sufficient appurtenant water to use in the irrigation of plaintiff's lands. Plaintiff offered evidence tending to show the existence of a sufficient supply of appurtenant water for the irrigation of plaintiff's lands, by showing the existence in 1920 of other wells in the vicinity of the Beach well site. Defendant now argues that defendant was under no obligation to develop water at the Beach well site for the reason that the only duty under the agreements made between the Power Company and the land owners was "to deliver through its distributing system" the appurtenant water. This brings us to the crucial question at issue, whether the Power Company, or the defendant as its successor, was obligated to develop water or to maintain the existing water supply. Under the terms of the agreements made between the land purchasers and the Ventura County Power Company, the Power Company (italics ours) "agrees to *deliver through its distributing system,* to the party of the second part, when demanded, on fifteen days' notice, *pro rata* of the acreage, in the order of distribution to which the land is entitled to water, under the rules and regulations of the

party of the first part, *all the water necessary and convenient for the irrigation of and being appurtenant to the following described land,* situate in the west one-half of the Rancho San Miguel, county of Ventura, state of California." It will be observed that the water to be delivered under the terms of these agreements is not limited to the water from flowing or artesian wells. The Power Company could not possibly deliver "all the water necessary and convenient for the irrigation of and being appurtenant to" the said land without at least maintaining the existing water supply, either by sinking new wells or pumping, if necessary. Such was the construction placed upon the contract by the Power Company, as the evidence shows that the Power Company continued to pump the existing wells on the Beach site to and including the year 1909. Besides, water was furnished to the land owners under these agreements up to the year 1920, both by the Power Company and by the defendant company, without any denial on the part of either company of the obligation to furnish such water when demanded. True, this water was furnished from another source owned by the Power Company and the defendant, as such right had been reserved in the agreement; but this right to furnish water from another source was reserved by the Power Company under the terms of the agreement only "when water from such other source of supply may be had." This right to supply such other water did not destroy the obligation of the Power Company and the defendant company to supply from the original source at the Beach well site when no other source of supply might be had. Neither was the obligation to deliver water limited to water supplied from the Beach well site, but the agreement of the Power Company was to deliver all the water necessary and convenient for the irrigation of and being appurtenant to the said land. There is sufficient testimony in the record to justify the conclusion that there was a supply of water underlying the entire west one-half of the Rancho San Miguel which was appurtenant to said lands. In support of the argument that the agreement of the Power Company was limited to water flowing from existing artesian wells and did not extend to water that might be obtained by pumping, appellant refers to the agreement of October 31, 1906, made between the San Miguel Company and the Ventura County Power Company wherein

the San Miguel Company sold to the Power Company, for a term of fifty years, all its pipe-lines, together with the electric motors, pumps, fittings, and belongings, with the right of way for said pipe-lines, reserving to itself all water and water rights lying and being beneath the surface of the west one-half of the rancho, "together with all the water flowing from, and hereafter to flow, from the wells now constructed and being upon said ranch, and hereby declares such water and water rights appurtenant to the land above described." The Power Company agreed to accept the property so conveyed. There is no definite provision in this agreement requiring the Power Company to sink additional wells, or to do any pumping. All the parties in interest concede that the agreements made between the land purchasers and the Power Company should be construed in the light of the contract between the San Miguel Company and the Power Company, providing for the distribution of water to said lands. These agreements were all part of one whole transaction, and the land buyers are entitled to the benefits of the agreement between the San Miguel Company and the Power Company. A clear analysis of this agreement will disclose the intention of the parties to provide a water supply for the lands being sold by the San Miguel Company. The agreement recites a resolution of the board of directors of the San Miguel Company wherein it is resolved that (italics ours) "*it is the purpose and intention of the San Miguel Company to improve by irrigation*" the west one-half of the Rancho San Miguel, and "to that end it has reserved and retained unto itself all the right, title and interest in and to *all the water and water rights lying and being beneath the surface of said land, for the purpose of distribution of said water to the said land as appurtenant thereto,* and to apportion and distribute such water as may be necessary to the irrigation, from a common source of wells or works, of such subdivisions of land as may be conveyed by the corporation from time to time and for the benefit of all of said land; and Whereas, it has *become necessary to apportion and distribute to purchasers of parcels of said land the water to which they are entitled as appurtenant to the land purchased;* therefore, be it resolved, by the board of directors of the San Miguel Company that this corporation sell and convey to the Ventura County Power Company

such land as may be determined upon by the board of directors of the contracting corporations, and at such price as may be determined upon, together with the wells now constructed and being upon said lands, *reserving and retaining unto the San Miguel Company, and to its successors, assigns and grantees, all the right, title, property and interest in and to all the water and water rights lying and being beneath the surface of the land that will be conveyed by authority of this resolution;* together with all the water flowing from and to hereafter flow from said wells, *and to all the water that may flow from any and all wells that may hereafter be constructed upon said lands, as a water right appurtenant to all that certain parcel of land* situated in Ventura county, California, known and designated as the west one-half of the Rancho San Miguel.'' It was further resolved that the San Miguel Company sell and transfer to the Power Company ''all the pipe lines now constructed upon the land above described, with the electric motors, pumps, fittings and belongings, as now existing, granting to the Ventura County Power Company the right, and the *Ventura County Power Company accepting the obligation, to distribute to the San Miguel Company, its successors, assigns and grantees, all the water appurtenant to the land as hereinbefore declared, when demanded for the irrigation of said land,* under such agreements and conditions as will make the distribution of said appurtenant water fair and equitable to all the land herein described.'' It was further resolved that upon the agreement of terms and receipt of the purchase price, the president or any vice-president, and James R. Martin (secretary of both corporations), be authorized to execute and deliver to the Power Company ''a deed of the land purchased, or such agreement of sale as may be determined upon, and further, to sell, assign, transfer and convey all the right, title and interest of this corporation in and to the pipe lines, electric motors, pumps, fittings and belongings above named, *upon the Ventura County Power Company executing a proper agreement that it will distribute the water appurtenant to the west one-half of the Rancho San Miguel, as hereinabove stated.*'' The agreement is made ''*in pursuance of the resolution aforesaid,*'' in consideration of the sum of ten dollars, and ''in consideration of a certain agreement of sale and purchase between the parties hereto

of certain land situated in the west one-half of the Rancho
San Miguel, . . . together with the wells constructed upon
said land, and of the covenants and agreements therein set
forth.'' The agreement provides that the San Miguel Com-
pany does sell and convey to the Power Company ''all
the pipe lines now constructed upon the west one-half of
the Rancho San Miguel, with the electric motors, pumps,
fittings and belongings, with the rights of way for said pipe
lines, as now situated upon said ranch, and the right of
way for pipe lines along the roads now delineated upon the
map of the land hereinbefore mentioned; also the right to lay
water conduits beneath the surface of the land, in such
manner as not to interfere *wit* the use of said land by the
owner thereof, and such right is reserved by the party of the
first part in conveying the land to the purchasers thereof.''
The contract further provides: ''The party of the first part
herein hereby *reserves, withholds and retains unto itself,
and to its successors and assigns all the right, title, property
and interest in and to all the water and water rights lying
and being beneath the surface of that tract of land known
as the west one-half of the Rancho San Miguel,* as herein-
before described, *together with all the water flowing from,
and hereafter to flow from the wells now constructed and
being upon said ranch,* and hereby declares such water and
water rights appurtenant to the land above described. The
party of the first part hereby grants to the Ventura County
Power Company *the right to distribute through pipe lines
and conduits water from (for) the irrigation of said land,*
under such agreements, rules and regulations *as will make
the distribution of said appurtenant water fair and equitable
to all the land herein described,* whether as a whole or in
subdivisions of whatever area, at such price as may be de-
termined upon. The party of the second part hereby
covenants and agrees to and with the party of the first part
that it does for itself, its successors and assigns, *accept the
property above mentioned, with the privileges and rights of
way particularly described, and upon the conditions and
reservations above set forth;* and does, for itself, its successors
and assigns, hereby agree that it will at all times *distribute
the water flowing from the wells above mentioned to the land
hereinabove described for purposes of irrigation of said land,
and as and appurtenant thereto all the water flowing from*

*said wells, as demanded by the holders of land* within the boundaries above set forth, under such agreements, rules and conditions *as will apportion and distribute said appurtenant water fairly and equitably to all the land herein described,* at such price as may be determined upon. To have and to hold all and singular the above described property, rights of way and privileges, unto the said Ventura County Power Company, and to its successors and assigns, for the term of *fifty years* from and after the date hereof."

[17] It can scarcely be denied that under the terms of the foregoing contract the Power Company was not only obligated to distribute the existing waters flowing from the wells on the land conveyed to it, but also in order to accomplish the purpose as recited in the resolution embodied in said contract "to improve by irrigation" said lands, it is clear that the Power Company had the right to distribute all of said appurtenant waters, whether flowing or underground, and to sink new wells and pump old and new wells, as appears from the fact that it is recited in the resolution that the San Miguel Company reserves to itself, its successors, assigns and grantees *all the right to all water* that may flow from any and all wells that may hereafter be constructed upon said lands; in fact, the purpose and intention of the agreement between the San Miguel Company and the Power Company to provide an adequate water supply to said lands is so positive that it might well be contended, in the absence of any definite provision therefor, that the Power Company was obligated by the whole tenor of said contract to develop and maintain the water supply from the lands agreed to be conveyed to the Power Company. But without so deciding, we find that the contracts between the Power Company and the land purchasers were not limited to flowing waters, but said contracts provide that the Power Company "agrees to deliver . . . all the water necessary and convenient for the irrigation of and being appurtenant to" said lands. The fact that the Power Company did not see fit to insert a clause in these later contracts limiting its obligation for delivery of water to flowing waters only, together with the fact that the Power Company continued pumping the wells to and including the year 1909, point to the conclusion that the Power Company and the San Miguel Company recognized not only the right of the

Power Company to maintain and develop a water supply, but also the implied obligation of the Power Company so to do. Under all the circumstances in the case it is impossible to conceive how the San Miguel Company and the Power Company intended to limit the source of supply to the then existing flow of artesian water. The term of the contract was for fifty years, and it was clearly the intention to provide irrigation from all appurtenant water, including the underground supply. We find no fault with the authorities cited by appellant, holding that flowing waters do not include pumped water, or additional water thereafter developed from underground sources; but we do not believe the agreements in this case were limited to flowing water as the wells then existed, or to water to flow thereafter from those wells. In the cases cited by defendant (*Mayberry* v. *Alhambra* etc. *Co.*, 125 Cal. 444 [54 Pac. 530, 58 Pac. 68]; *Jones* v. *Van Nuys*, 161 Cal. 158 [118 Pac. 541]), the contracts sued upon were contracts to take "flowing" waters and "water hereafter to flow"; and it was rightly held that these words denote the natural flow and do not reasonably denote waters to be in the future artificially developed. In the case at bar there was no limitation to flowing waters in the contracts sued upon; but "all water necessary and convenient for the irrigation of and being appurtenant to" the lands described therein, "from the wells or works situate and being on the west one-half of the Rancho San Miguel," was included in the contracts sued upon.

[18] Defendant questions the sufficiency of the evidence to show that it could have developed water at the Beach well site either "in an amount sufficient to supply necessary and convenient demands for the irrigation" of plaintiff's lands, or "in an amount more than sufficient to supply said land *pro rata* of its acreage." We have examined the evidence offered by the plaintiff and believe this evidence sufficient to support the findings of the trial court. It was incumbent upon the defendant to meet this evidence by affirmative evidence showing that the defendant had attempted to develop such amount of water on the Beach well site and that such amount of water could not be developed.

[19] Defendant's next objection to the findings is that the evidence is not sufficient to justify the finding that there was any appurtenant water. Defendant is in no position to

urge this objection, since the Power Company, as its predecessor in interest, entered into the agreement with the San Miguel Company and accepted the provisions thereof, wherein it was declared that the Beach well site and all subterranean waters underlying the rancho were appurtenant thereto and for the benefit of all said lands.   Subsequent purchasers would derive the benefit of this reservation as against the Power Company.

[20] Finally, defendant asserts that the evidence is insufficient to support the finding that plaintiff was unable to secure water from any other source for the purpose of irrigating his land, for the reason that plaintiff had water of his own, and therefore that the proper measure of his damages herein was not the damage to his crops.   Plaintiff testified that he had 150 inches of water which he offered to deliver to the defendant if the defendant would distribute it to him, but that defendant's agent refused to distribute the water for the reason that the defendant company did not recognize an obligation so to do and did not wish to accept liability.   Under these circumstances this supply of water was not available to the plaintiff.   Hence the proper measure of damages is the loss of crops of plaintiff as a result of the fact that his crops were not irrigated, less the cost of production and less the net value of the crops actually produced.   The plaintiff fulfilled the active duty of using all ordinary care and making all reasonable exertions to render the injury as light as possible, as such duties are imposed by the law as declared in the authorities cited by the defendant.

[21] Appellant advances the objection that the court improperly admitted evidence of the value of the crop plaintiff might have raised under irrigation, and cites the cases of *Crow* v. *San Joaquin etc. Irr. Co.*, 130 Cal. 309 [62 Pac. 562, 1058], *Pallett* v. *Murphy*, 131 Cal. 192 [63 Pac. 366], and *Fresno Canal & Irr. Co.* v. *Perrin*, 170 Cal. 411 [149 Pac. 805], as authority for the rule that the proper measure of damages in such a case in this state is the difference in rental value of the land, with or without water.   However, upon examination of these cases we find the rule so stated where the crops had not already been planted.   In the case at bar the bean crop had been planted before the demand for water was made.   In such case the proper rule of dam-

ages for the destruction of a growing crop is the rule followed by the trial court. In *Lowe* v. *Yolo County etc. Water Co.*, 157 Cal. 503 [108 Pac. 297], it was held that the damages were measured by the net profits of what an alfalfa crop would have been for the season if properly irrigated. In *Auchmoody* v. *City of Manhattan Beach*, 53 Cal. App. 726, 731 [200 Pac. 803], damages were allowed for depreciation and destruction of growing crops by failure to deliver water. The court said (page 731) : "Appellant relies upon certain decisions which have held that where damages are claimed for refusal to furnish water upon land the true measure of damages must be determined by ascertaining the difference between the rental value of the land with water and its rental value without water. (*Crow* v. *San Joaqiun Irr. Co.*, 130 Cal. 309 [62 Pac. 562, 1058] ; *Fresno Canal & Irr. Co.* v. *Perrin*, 170 Cal. 411 [149 Pac. 805].) These were cases in which the plaintiff attempted to prove that he would have raised certain kinds of crops and that he would have obtained certain profits therefrom if he had received the supply of water to which he was entitled. As was said by the court in *Pallett* v. *Murphy*, 131 Cal. 192 [63 Pac. 366] : 'Evidence as to the value of a possible crop that might be grown with the use of water would be as purely speculative as could well be imagined.' But in the present case the losses incurred consist in the depreciation or destruction of value of property actually in existence. These losses were capable of ascertainment by direct evidence, and were not at all speculative in their nature. Under these circumstances, the loss of chickens which died, and the loss of the growing crops which were destroyed, were of such a nature that recovery can be had therefor. (*Teller* v. *Bay & River Dredging Co.*, 151 Cal. 209 [12 Ann. Cas. 779, 12 L. R. A. (N. S.) 267, 90 Pac. 942].)" In *Rystrom* v. *Sutler Butte Canal Co.*, 72 Cal. App. 520 [249 Pac. 53], it was held that the damages to growing crops are to be ascertained by first determining from the evidence the market value of the probable yield of the growing crop if the water had been furnished as agreed, and then deducting therefrom the reasonable cost of marketing and producing such crop, and also deducting therefrom the net market value of the crop actually produced. The foregoing rule for ascertaining the damages to growing crops was followed in *Teller* v. *Bay &*

*River Dredging Co.,* 151 Cal. 209, 212, 214 [12 Ann. Cas. 779, 12 L. R. A. (N. S.) 267, 90 Pac. 942]; *Stewart* v. *Erskine-Bolst,* 66 Cal. App. 461, 471, 472 [226 Pac. 644]; *Chambers* v. *Belmore L. & W. Co.,* 33 Cal. App. 78, 82, 83 [164 Pac. 404]; *Barlow* v. *Frink,* 171 Cal. 165 [152 Pac. 290]; *Harrison* v. *Spring Valley H. G. Co.,* 65 Cal. 376 [4 Pac. 381]; *Telander* v. *Tujunga Water & Power Co.,* 43 Cal. App. 492, 497 [185 Pac. 504]; *Allen* v. *Los Molinos Land Co.,* 25 Cal. App. 206, 211 [143 Pac. 253].

[22] Appellant's objection that the court improperly admitted evidence that the Beach well site could have furnished sufficient water for irrigating the lands described in the agreements sued upon is not well taken. This water was appurtenant to plaintiff's land and there is no testimony in the record of demands being made by other owners for such water.

Appellant's statement of the respects in which the judgment is not supported by the findings is based primarily upon the same reasons in respect to which defendant alleges that the complaint does not state a cause of action. Our ruling that the complaint does state a cause of action disposes of this objection.

[23] Appellant further objects that there is no finding with reference to what amount of water was necessary or convenient for the irrigation of the plaintiff's lands. No such allegation appears in the first three causes of action. On special demurrer, the fourth cause of action was amended to state the amount of water necessary for the irrigation of the lands described in said cause of action. Plaintiff testified that about 4,700 inches of water would have been required for irrigation. The court in making its decision indicated that the cost of production, including water, was being deducted from the total value of the crop that would have been grown under irrigation. The court in its findings stated that at all times mentioned in the complaint defendant was the owner of water appurtenant to said lands in an amount sufficient to supply the necessary and convenient demands for the irrigation of said lands and in an amount more than sufficient to supply said land *pro rata* of its acreage in the order of distribution to which said land was entitled to water; that defendant did not deliver any water for irrigation of the lands described in the first three

causes of action, and that said lands were not irrigated; and that defendant delivered 210 inches only for irrigation of the land described in the fourth cause of action, which was not sufficient properly to irrigate said land; that said lands were properly cultivated and harvested; that there were grown and harvested from each of said parcels a certain quantity of beans and straw; that if defendant had provided the plaintiff water for irrigation of said lima bean crop at the time and in the quantity demanded, said parcels of land would have produced a certain greater amount of beans and straw; and that by reason of and as a result of the failure and refusal of defendant to furnish plaintiff water for the irrigation of said lima beans, the plaintiff was damaged in a certain sum as to each of said parcels. We believe the evidence sufficient to support the findings and the findings sufficient to support the judgment.

There being no prejudicial error, it is ordered that the judgment be affirmed.

Conrey, P. J., and York, J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on June 16, 1927, and a petition by appellant to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on July 18, 1927.